UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NOOR Staffing Group LLC d/b/a J.D. & Tuttle Hospitality Staffing, <br><br> *Plaintiff,* <br><br> v. <br><br> Staff Management Solutions, LLC, *et al.*, <br><br> *Defendants.* | No. 19 CV 529 <br><br> Judge Lindsay C. Jenkins |
| Staff Management Solutions, LLC, *et al.*, <br><br> *Counter Claimants*, <br><br> v. <br><br> NOOR Staffing Group LLC d/b/a J.D. & Tuttle Hospitality Staffing, <br><br> *Counter Defendant.* | |

MEMORANDUM OPINION AND ORDER

Shortly after Plaintiff Noor Staffing Group LLC acquired Corporate Resource Development and its business, Noor signed a contract with Defendant Staff Management Solutions, LLC to provide Staff Management with temporary labor services similar to those Corporate had provided to Staff Management. Noor alleges that Staff Management breached that contract in two ways: by paying approximately $1 million into Corporate's bank account, rather than Noor's, and by failing to pay for roughly $200,000 in services Noor provided to a client.[1] Staff Management moves for

---

[1] Three brief points of clarification: (1) Noor sued Staff Management and its affiliate PeopleScout MSP, LLC. [Dkt. 1.] Both parties treat Staff Management and PeopleScout

1

summary judgment on both claims. [Dkt. 184.] For the reasons explained below, Staff Management's motion is granted.

## I.      Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022).

The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). However, a party needs evidence, not mere speculation, to defeat summary judgment. *See Moran v. Calumet City*, 54 F.4th 483, 491 (7th Cir. 2022). And while ordinarily when both parties support their narratives with evidence, summary judgment will be improper, *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003), when the nonmovant's version of events is "blatantly contradicted by the record," it may be appropriate to grant summary judgment, *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997).

collectively [Dkt. 185 at 4; Dkt. 193 at 1], so the Court refers only to Staff Management. (2) Noor's Complaint included an "account stated" claim in addition to its breach of contract claims, but Noor has abandoned that claim [Dkt. 193 at 1 n.1], and the Court addresses it no further. (3) The precise sums at issue are $1,082,447.29 and $206,744.77; the Court refers to these figures as $1 million and $206,000 for convenience.

## II.    Background

The Court draws on the parties' Local Rule 56.1 filings to recount the facts. The facts are not in dispute except where otherwise noted.

### A.    Noor and Staff Management's Relationship

During the period relevant to this case, Staff Management was a managed service provider ("MSP") that helped clients obtain temporary labor from entities like Noor, a temporary staffing organization or supplier of temporary labor. [*Id.* ¶¶ 1–3.] Staff Management was an intermediary. Clients requested temporary labor through Staff Management, Staff Management arranged for a supplier to provide the labor, the clients paid Staff Management, and Staff Management in turn paid the supplier. [*See id.* ¶ 7.]

On January 15, 2015, Staff Management entered a Supplier Non-Exclusive Master Services Agreement with Corporate, pursuant to which Corporate would provide temporary labor for Aramark, a Staff Management client. [*Id.* ¶¶ 3–4.] Corporate requested that Staff Management make payments to Corporate into a Wells Fargo bank account. [*Id.* ¶ 4.] On February 26, 2015, Corporate sold its business and assets to Noor. [*Id.* ¶ 5.] A month later, on March 25, 2015, Noor and Staff Management entered into their own Supplier Non-Exclusive Master Services Agreement (the "Agreement"). [*Id.* ¶ 6.] Pursuant to the Agreement, Noor began to supply Aramark with temporary labor. [*Id.* ¶¶ 5–7.]

3

### B. The Agreement

The parties agree that the Agreement governed Noor and Staff Management's relationship and that the Agreement forms the basis for Noor's breach of contract claims. [*Id.* ¶¶ 6, 12.] The Agreement contained the following terms:

- All communication regarding Aramark's temporary labor needs was to go through Staff Management using an electronic Vendor Management System ("VMS"). Noor was prohibited from directly contacting Aramark.
- When Noor accepted a job, Staff Management would send a work order to Aramark, and Noor's right to payment was contingent upon Noor receiving an executed work order from Staff Management.
- Noor would submit invoices through the VMS within 30 days after work was completed; it had no entitlement to payment for work performed that was not submitted in this manner.
- Staff Management would consolidate Noor's invoices and send Aramark a weekly invoice, which would pay amounts "not in dispute" within 30 days.
- Upon receipt and clearance of Aramark's funds, Staff Management was required to pay Noor within five days. Clearance of Aramark funds was an explicit precondition for Staff Management's duty to pay Noor.

[*Id.* ¶¶ 8–10.] While Noor does not dispute that these terms appear in the written contract, it contends that the parties implicitly modified the Agreement—and that Staff Management waived strict compliance with its terms—through custom and practice. [*Id.* ¶¶ 8–9, 11–12.] The Court must therefore determine whether these disputes are genuine for summary judgment purposes. *See Anderson*, 477 U.S. at 248.

Noor's only evidence in support of its argument that the parties amended the Agreement through custom and practice is an affidavit of Carlos Rodriguez [Dkt. 194-1; *see* Dkt. 194 ¶¶ 8–9, 11–12, 25, 27–29, 31–34, 52–57], a Noor employee who was twice deposed as Noor's business representative under Federal Rule of Civil Procedure 30(b)(6). [Dkt. 186-2, 186-9.] Staff Management invokes the sham affidavit rule to argue that Rodriguez's affidavit does not create a genuine dispute of fact. [Dkt.

4

196 at 11–13;[2] *see* Dkt. 197.][3] The sham affidavit rule is an exception to the general principle that when there is evidence on both sides of a dispute, including self-serving affidavits, summary judgment is inappropriate. *See, e.g.*, *Foster v. PNC Bank, Nat'l Ass'n*, 52 F.4th 315, 320 (7th Cir. 2022). As the Seventh Circuit has explained,

> [T]he sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony. … The organizing principle of our sham-affidavit practice is simply stated: a *genuine* issue of material fact cannot be conjured out of nothing. We adopted the sham-affidavit rule to weed out unfounded claims, specious denials, and sham defenses.

*James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (cleaned up). The sham affidavit rule is narrow. It does not bar an affiant from trying to clarify or explain away seemingly damaging testimony. *See Seshadri*, 130 F.3d at 801–02. Nor does it require striking an offending affidavit in full; only the contradictory portions are disregarded. *See Dunn v. Menard, Inc.*, 880 F.3d 899, 910–12 (7th Cir. 2018). The Court agrees with Staff Management that Rodriguez's affidavit contradicts his deposition testimony in part, so it will disregard those portions of the affidavit.

---

[2]  Citations to page numbers of briefs refer to the page number listed on the filing. Citations to page numbers of exhibits refer to the electronic pagination.

[3]  The Court notes that docket entry 197 is a reply to Noor's Local Rule 56.1 response, which raises objections to numerous paragraphs of that response. This filing is not proper. Local Rule 56.1 does not permit a summary judgment movant filing such a reply. N.D. Ill. Loc. R. 56.1(e)(2) ("If a party contends that its opponent has included objectionable or immaterial evidence or argument in a LR 56.1 submission, the party's argument that the offending material should not be considered should be included in its response or reply brief."). The effect of Staff Management's Local Rule 56.1 is that it has used more than 15 pages for argument without the Court's permission. *See* N.D. Ill. Loc. R. 7.1. However, Noor has not objected to the Local Rule 56.1 reply or the cumulative length of Staff Management's papers, so the substantive effect is similar to an unopposed motion to file an oversize brief, and the Court will consider all of Staff Management's arguments. The Court reminds litigants, including Staff Management, to read the Local Rules carefully because the Court can—and at a party's request often will—require strict compliance with the Local Rules. *See Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 611 n.13 (7th Cir. 2023).

### 1. Rodriguez's Deposition Testimony

Rodriguez was deposed twice as Noor's business representative. [Dkt. 186-2, 186-9.] *See* Fed. R. Civ. P. 30(b)(6). Rodriguez worked at Noor from late November 2015 through 2020 as a finance manager. In 2020, he began working as finance director, a position he held when he was deposed. [Dkt. 186-2 at 9:14–10:10.]

During his first deposition, Rodriguez testified about how Noor's relationship with Staff Management worked under the Agreement:

> From my knowledge the way this is supposed to operate is that Aramark makes contact … with the venues. [Aramark] pretty much ha[s] contracted services with them. [Aramark] in turn reach[es] out … to companies [like Noor] just to staff these events. …
>
> [T]he venues would submit orders, I believe they call them requisitions. We fill the requisitions with the appropriate personnel. That gets approved by the venue. And the payment would flow from Staff Management to us after the hours have been approved in the system. And the system being IQ Navigator [or IQN].

[*Id.* at 33:17–34:13; *see id.* at 34:19–35:3 (testifying that the venues would make the requisitions through the IQN).] Although this was "the usual course of the process," Rodriguez testified that "from time to time they would send us e-mail requisitions promising to open up those requisitions [in the IQN] at a later point." [*Id.* at 35:5–:8.] Rodriguez testified that "the venues" were the primary entities that would approve hours worked by Noor workers in the IQN, although his understanding was that Noor would get "approvals coming from people directly in Aramark from the venue, [or] from [Staff Management]." [*Id.* at 35:22–36:11.] He also agreed that "once the hours were approved [Staff Management] would get paid and they would pay us in turn." [*Id.* at 35:12–36:2.]

Rodriguez was asked about the relationship between the VMS and the IQN. He testified that his understanding was that they were distinct, suggesting that the IQN was a system that fell under the larger category of a VMS. [*Id.* at 42:3–43:7.] Rodriguez had little familiarity with the IQN or the VMS. He had no clear understanding of who owned or operated the VMS, and he did not personally use it because it was a "forward facing" system, while he "only deal[t] with back of the house applications." [*Id.* at 38:9–39:8.] Rodriguez also did not use the IQN. [*Id.* at 43:9–:11.]

Rodriguez was also asked about provision 3.*l* of the Agreement, which states that Noor would communicate exclusively with Staff Management with respect to work done pursuant to the Agreement and would not communicate with clients such as Aramark. [*Id.* at 46:16–:24; *see* Dkt. 1-1 at 4.] Rodriguez acknowledged that the contract required Noor to communicate only with Noor, but he testified that, in practice, "the client reaches out sometimes … when they're not able to go through a system and [the client] sa[ys] they're going to put it on [to a VMS] later on." [Dkt. 186-2 at 47:1–48:1.] When asked what he meant by "client," Rodriguez testified that he "do[esn't] have any communication … with the front facing. So it would be a combination of the venue, Aramark, or Staff Management, Peoplescout, whoever is putting in the request … for the services." [*Id.* at 48:2–:8.] Rodriguez was then asked whether he understood that Noor would not be paid by Staff Management if hours are not put into the VMS. [*Id.* at 48:9–:13.] He did not disagree with that point, but he stated that "it depends if the client is stating via e-mails that they are going to put [the work order] in, I mean … that's an agreement in itself." [*Id.* at 48:14–:17.]

Later in the deposition, Rodriguez recapped some of this testimony, saying that how Noor was supposed to communicate under the Agreement was not a black and white issue because in "e-mail correspondence a lot of the times I don't see a Staff Management e-mail attached to it. … [I]t might be, you know, at Aramark" or "at … True Blue …. Yeah, and I['ve] seen the venue's e-mails as far as the communication when it comes to the services." [*Id.* at 70:15–72:21.] Rodriguez agreed that when he mentioned "e-mail communication that didn't have … at Staff Management dot com" he was "talking about e-mails or communications from … either the vendor or Aramark or some combination thereof." [*Id.* at 72:22–:11.] He then reiterated that he was unfamiliar with whether the contract had been modified with respect to communication provisions, stating that "My communication … with Staff Management is strictly about payment allocation. … [M]y concern wasn't really … with the front of house." [*Id.* at 74:9–75:14.] He also understood that Noor "only placed temps with [a] requisition" in the IQN. [*Id.* at 75:15–76:22.]

In Rodriguez's second deposition, he was asked more specific questions about the VMS and IQN and how those systems related to Noor providing temp workers to Aramark and being paid for those services. He testified that while under the contract, all communication had to go through the IQN, and that was "the regular course of business," "but we do get request[s] via e-mails, phone calls, and many other ways from the client and Aramark." [Dkt. 186-9 at 11:8–12:4.] But he testified that "[t]here is no way [Noor] would take an order from an Aramark client that doesn't get put through the IQ Navigator." [*Id.* at 15:19–:21.] With respect to a specific invoice, he

testified that it "wasn't paid, so they didn't put it through the IQ Navigator." [*Id.* at 15:22–16:1.] Rodriguez then agreed that "in order to get paid, you have to put it through the IQN … [a]nd Staff Management … would have to approve of the work." [*Id.* at 16:2–:9.]

Rodriguez was then shown an example email from Sonia Lewis who was identified as a "meeting and event planner for City," a client. [*Id.* at 13:4–14:3.] He initially testified that he "[did] not know" whether Lewis worked for Staff Management, then testified that Lewis "is clearly employed by Staff Management, because … she has to have access to the system in order to put these requests in." [*Id.* at 14:9–15:16.] He then testified that her email "says Aramark, so that to me clearly states she works for [Staff Management]." [*Id.* at 17:8–:9.] When asked if he knew that Aramark and Staff Management were two different companies, he stated, "I don't know what the relationship is when it comes to who owns who …. So, just by looking at someone's e-mail address, I can't tell you exactly … who they are employed with." [*Id.* at 17:10–:23.] When pressed, Rodriguez eventually agreed that he lacked personal knowledge about the relationship, and it was possible that Aramark and Staff Management were separate companies. [*Id.* at 17:24–18:14.]

A significant portion of the deposition was devoted to reviewing emails and timecards relating to hours worked by temporary workers supplied by Noor but not entered in the IQN or VMS. Rodriguez agreed that he saw no indication on the emails themselves that Staff Management or PeopleScout was notified about timesheets or invoices, although he testified that he did not know which entities the email

9

recipients worked for. [*See, e.g.*, *id.* at 22:11–:23:12 ("Q. … Did you see the words Staff Management, SMS or PeopleScout in any of those exhibits? A. I did not see those words.").] Rodriguez also testified that certain invoices for work done based on email requisitions were not entered into a VMS:

> Q.    … [Y]ou identified timecards and work being performed outside of the IQN VMS system that was never entered or approved by [Staff Management], and you are seeking for [Staff Management employee] Janae Brown's approval in that correspondence, correct?
>
> A.    It wasn't entered, but it wasn't being outside [the contract], no ….
>
> Q.    -- okay, I will use your words, not entered into the VMS system.
>
> A.    Correct, by the supervisor, or whoever it is.
>
> Q.    Got it. It was never entered, and [Staff Management] was not notified until Mr. Rodriguez diligently sees all this, by the time he is in there this work has been performed, it was never entered in the VMS system, we are alerting Janae Brown, saying, Ms. Brown, … these stacks of 1300 documents was never entered into the VMS system, can you please approve it …, correct?
>
> A.    That's correct.

[*Id.* at 57:4–58:10.] The correspondence in question occurred in 2018, years after the work had been performed. [*See, e.g.*, *id.* at 54:7–:23.]

## 2.    Rodriguez's Affidavit

Paragraphs 12–17 of Rodriguez's affidavit [Dkt. 194-1] address the same facts. Some of his assertions are consistent with or clarify his deposition testimony, while others contradict his deposition testimony. The former may be considered but the latter may not. *See Dunn*, 880 F.3d at 910–12; *Seshadri*, 130 F.3d at 801–02.

The relevant portion of Rodriguez's affidavit begins by explaining that Noor provided labor to Aramark that was not requisitioned through the VMS. [Dkt. 194-1

¶ 12.] This assertion is consistent with the deposition testimony and can be considered at summary judgment. However, when Rodriguez provides more details about that practice, his affidavit conflicts with his deposition testimony without any plausible explanation for the discrepancies.

He states that Noor often provided Aramark with labor at Aramark's direct request, rather than through a request via the VMS. [*Id.* ¶¶ 13–14.] "In such cases, Noor provides labor at the request of Staff Management" and "relies upon Staff Management to open the appropriate requisitions for that labor." [*Id.* ¶ 13.] Rodriguez states that there were four ways time entries would be handled:

> 1) the worker would clock in and the time entered into the payment system; 2) the amount of time would be entered by Noor staff into the payment system 3) the worker's time would be kept on time sheets and then later entered into the payment system; and 4) the time would be forwarded to Staff Management by email to be entered into the payment system. These practices and procedures have been followed to this day.

[*Id.* ¶ 14; *see also id.* ¶ 16 ("Noor provided the staffing requested by Aramark and provided the time records to Staff Management the same as Noor has always done in such circumstances."), ¶ 17 (communications between Noor and Staff Management about services provided to Aramark but not entered into the VMS "were not out of the ordinary and Noor and Staff Management have always worked together in this fashion. On numerous occasions, in fact almost on a weekly basis, Noor has provided temporary labor for ARAMARK prior to Staff Management issuing a requisition for that labor. Staff management has never rejected [such] a request for payment ….").]

Rodriguez's detailed description of how Noor, Staff Management, and Aramark conducted work requisitions outside of the VMS conflicts with his deposition

testimony. There, he denied having knowledge of how the VMS and IQN worked or the "front facing" means by which work orders and invoices were entered into the system. He also indicated that it was the client, not Staff Management, who was responsible for putting work orders into the system. [Dkt. 186-2 at 47:1–48:17.][4] Both at the time when Rodriguez was being deposed in 2022 and when he submitted his affidavit in 2023, the events relevant to this case had occurred in the past, so he could not have acquired additional personal knowledge of these events. *Cf. James*, 959 F.3d at 317 (sham affidavit rule does not apply when there is new evidence). Nor does he suggest that his memory failed during the depositions and his earlier testimony was "demonstrably mistaken." *See id.* (citation omitted).[5] Because this portion of the affidavit purports to make assertions based on personal knowledge that Rodriguez denied having during his depositions, it is inconsistent with that testimony and cannot be used at summary judgment. *Id.* at 316.

Other parts of Rodriguez's affidavit may clarify or supplement his deposition testimony. Citing email communications [Dkt. 194-1 Ex. C], Rodriguez states that with respect to the disputed $206,000, Noor notified Staff Management by email that

---

[4]     During his depositions, Rodriguez expressed uncertainty about who Noor's client was. [Dkt. 186-2 at 48:2–:8 (suggesting the client "would be a combination of the venue, Aramark, or Staff Management, Peoplescout, whoever is putting in the request … for the services" but denying further knowledge about "front facing" communication).] He also suggested that Aramark and Staff Management were related companies and mistakenly referred to Staff Management as "Staffmark" several times. [Dkt. 186-9 at 13–19, 31–32.] It is undisputed that Aramark and Staff Management are distinct companies [*see, e.g.*, Dkt. 194 ¶¶ 3–4, 7], so no reasonable jury could find based on Rodriguez's testimony that Staff Management was a "client" responsible for putting work orders into the VMS after Noor provided services.

[5]     Further, the Court doubts such an explanation could prevail for a Rule 30(b)(6) deposition because the deponent must prepare for the deposition. *See, e.g.*, *Kraft Foods Global, Inc. v. United Egg Producers, Inc.*, 2023 WL 5647204, at *7–8 (N.D. Ill. Aug. 31, 2023).

these funds had not been paid. Staff Management responded that these work orders had not been put into the VMS and it "assured Noor that it would follow up with ARAMARK and that Noor would be paid for that labor. Staff Management did not object to Noor's request and did not assert that Noor was in violation of the Agreement by either providing labor for which a requisition had not been placed or delaying its request for payment." [*Id.* ¶ 15.] Rodriguez adds that Noor was paid for work done at one Aramark location as a result of its communications with Staff Management and that Staff Management told Noor not to contact Aramark directly because Staff Management would do so. [*Id.* ¶ 17.] As a result, Rodriguez understood Staff Management to have assured Noor that it would be paid the disputed $206,000. [*Id.*]

Staff Management objects to this testimony as inconsistent with Rodriguez's deposition testimony [Dkt. 196 at 11–13; *see also* Dkt. 195 ¶¶ 55, 57], but the Court disagrees. Rodriguez testified about the emails regarding the $206,000 during his depositions, and his position was that Noor had notified Staff Management (or its affiliate, PeopleScout) about the services Noor had not been paid for and that Staff Management had agreed to ensure that Noor was paid. [*See, e.g.*, Dkt. 186-9 at 23–31.] Rodriguez's affidavit explains further about his understanding regarding those emails and attaches them. This portion of the affidavit clarifies or supplements the deposition testimony, so the Court will not disregard it. *See James*, 959 F.3d at 317.

## C.    The Wells Fargo Bank Account

According to Staff Management, after Noor acquired Corporate and began providing Aramark with temporary labor, Staff Management continued making payments into a Wells Fargo bank account formerly belonging to Corporate. [Dkt. 194

¶¶ 18–23.] In total, Staff Management made 58 deposits totaling the disputed $1 million into that account. [*Id.* ¶¶ 19–20.] Noor disputes this, pointing out that at various stages in this litigation, Staff Management made representations that the amount paid into the Wells Fargo account was less than $1 million or that more or fewer than 58 deposits were made. [*Id.* ¶¶ 18–23, 40–42.] This discrepancy, it argues, means that a jury must determine how much Staff Management paid into the account. [Dkt. 193 at 6–8.]

Staff Management argues that there is no genuine dispute as to these funds. [*See* Dkt. 196 at 5–6.] The Court agrees. Staff Management notes that Noor does not dispute the authenticity or accuracy of the bank records. [*See* Dkt. 194 ¶¶ 20, 40–42.] No reasonable jury could credit Staff Management's preliminary representations about the amount deposited in the account over the unchallenged bank records themselves. *See Seshadri*, 130 F.3d at 802 ("Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)). Thus, there is no genuine dispute that Staff Management paid the $1 million into the Wells Fargo account.

For its part, Noor asserts that in March 2015, it instructed Staff Management to remit payments to Noor's Sterling National Bank account instead of the Wells Fargo account and sent a "Final Notice: Remittance Instructions" confirming those

instructions in June 2015. [Dkt. 195 ¶¶ 36, 50.]6 Despite telling Staff Management to remit payment to the Sterling account, Staff Management continued to deposit funds in the Wells Fargo account between June 2015 and February 2016. [*Id.* ¶ 51.] In total, Noor contends that Staff Management failed to remit $1 million to the proper bank account during this period. [*Id.*]

### D.    Procedural History

#### 1.    Corporate's Bankruptcy Proceeding

Corporate, the entity Noor purchased, filed for Chapter 11 bankruptcy on July 23, 2015. [Dkt. 194 ¶ 16 & n.2.] In connection with that proceeding, the Wells Fargo account was part of Corporate's bankruptcy estate under the control of the Chapter 11 trustee. *Noor Staffing Grp. LLC v. Staff Mgmt. Sols., LLC*, 2020 WL 11762285, at *2 (N.D. Ill. Dec. 7, 2020). [*See* Dkt. 78-4 ¶ 11.] The trustee initiated an adversary proceeding against Noor, claiming among other things that the funds in the Wells Fargo account were property of the estate, and Noor settled that proceeding on June 2, 2017. *Noor Staffing*, 2020 WL 11762285, at *2. [*See* Dkt. 78-9 (settlement agreement).] Under that agreement, Noor "release[d] any claims to the entirety of the [funds] held [in the] Wells Fargo [account], the ownership of which is disputed, … to the Trustee." [Dkt. 78-9 at 11.] In exchange, the trustee released claims against Noor. [*Id.* at 17–18.]

---

6    Staff Management disputes the March 2015 communication, noting that Noor has not provided a record of such communication. [Dkt. 195 ¶ 50.] The Court finds that there is at least a genuine dispute as to whether communication in March occurred because a jury could infer from the email correspondence that Noor did inform Staff Management about the bank account change in March. [*See* Dkt. 194-1 at 9, 13.] In any event, any dispute is immaterial because the disputed payments date from June 2015 to February 2016. [Dkt. 195 ¶ 51.]

2. **This Litigation**

In 2019, Noor brought this lawsuit against Staff Management. It asserted two breach of contract theories, related to the disputed $1 million and $206,000. [Dkt. 1.] In 2020, Staff Management moved for judgment on the pleadings with respect to the disputed $1 million. [Dkt. 78 at 8.] It argued that in the bankruptcy proceeding, Noor claimed an interest in the funds in the Wells Fargo account (which it released in the settlement agreement), so it could not claim in the present proceeding that Staff Management had not paid it by depositing funds in that account. [*Id.* at 1–2.]

The Court agreed with much of Staff Management's argument, but it held that a motion for judgment on the pleadings was an improper vehicle to resolve the parties' dispute. It explained:

> The crux of defendants' motion is that the pleadings and documents demonstrate that Staff Management paid all of the amounts claimed by plaintiff for services it rendered to ARAMARK into the Wells Fargo Account, and that plaintiff claimed a right to and then used those funds to settle the adversary action. …
>
> The court's review of all the admissible documents establishes without doubt that Staff Management mistakenly made payments into the Wells Fargo Account for work plaintiff performed for ARAMARK after plaintiff purchased [Corporate's] business. Plaintiff admits this much. There is also no doubt that plaintiff used those funds to settle the adversary action. Thus, there is no doubt that in the instant action defendants are entitled to at least a set-off for those payments. What cannot be determined from the admissible evidence is the extent of those payments (as opposed to payments for work performed by [Corporate]), and whether the payments constitute the total amount owed by Staff Management to plaintiff.

*Noor Staffing*, 2020 WL 11762285, at *2. The Court therefore denied the motion for judgment on the pleadings. Staff Management has now moved for summary judgment on Noor's claims to the disputed $1 million and $206,000. [Dkt. 184.]

16

### III.    Analysis

Noor pursues separate breach of contract claims with respect to the disputed $1 million and the disputed $206,000. [Dkt. 1.] Under Illinois law, which the parties agree applies [*see* Dkt. 185 at 15–16; Dkt. 193 at 9–10], "[t]he essential elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resultant injury to the plaintiff." *Pepper Const. Co. v. Palmolive Tower Condos., LLC*, 59 N.E.3d 41, 66 (Ill. App. Ct. 2016) (citation omitted). On the summary judgment record, a reasonable jury could not find in Noor's favor on either claim; therefore, Staff Management is entitled to summary judgment. *See Anderson*, 477 U.S. at 248.

#### A.    The Disputed $206,000

Noor argues that Staff Management owes it approximately $206,000 for work it provided to Aramark outside the process contemplated by the Agreement. [Dkt. 193 at 8–9.] Staff Management moves for summary judgment on this count, arguing that Noor cannot recover because it did not comply with the terms of the Agreement in connection with this work. [Dkt. 185 at 20.] *See Rsrv. Hotels PTY Ltd. v. Mavrakis*, 790 F.3d 738, 740 (7th Cir. 2015) ("Under Illinois law, a party cannot sue for breach of contract without alleging that he has himself substantially complied with all the material terms of the agreement." (cleaned up)). Noor counters that parties can waive strict enforcement of contractual terms under Illinois law, which Noor and Staff Management did here through custom and practice. [Dkt. 193 at 9–10 (citing caselaw).] However, even viewing the record in the light most favorable to Noor, *see Majors*, 714 F.3d at 532, Noor cannot establish the elements of its claim.

In arguing for waiver, Noor relies exclusively on Rodriguez's affidavit and the email correspondence he discusses. [Dkt. 193 at 10–11; Dkt. 194 ¶¶ 54–57.] As explained above, that affidavit can be considered at summary judgment only in part. The Court disregards Rodriguez's detailed description of the parties' practice of departing from the written terms of the Agreement because those assertions contradict his deposition testimony. *See James*, 959 F.3d at 316. Rodriguez's affidavit can be used to establish: (1) that Aramark regularly asked Noor to provide temporary workers directly, rather than through the VMS, and (2) that Noor and Staff Management engaged in email correspondence regarding the disputed $206,000, which Rodriguez asserts establishes that Staff Management said it would ensure Noor got paid. [*See* Dkt. 194-1 ¶¶ 13–17.] But Noor cannot contradict Rodriguez's deposition testimony that when work was done after a direct request, it was the responsibility of the client—here, Aramark—"to put [the work order] on [to the VMS]," and that Noor would be paid only after a work order was put on the VMS and paid through Staff Management. [*See* Dkt. 186-2 at 47:1–48:8; Dkt. 186-9 at 15:22–16:9.] For Noor to survive summary judgment, it must point to admissible evidence showing either that Aramark submitted work orders through the VMS or that Staff Management took responsibility for Aramark doing so. *See Moran*, 54 F.4th at 491. Noor cannot do so.

It is undisputed that work orders associated with the disputed $206,000 were never submitted through the VMS or paid by Aramark. [*See* Dkt. 194 ¶¶ 30–35 (Noor raising some disputes but not as to these points).] Under the terms of the Agreement,

18

therefore, Staff Management had no obligation to pay Noor these funds [*id.* ¶¶ 9–10], and Noor has no evidence that Staff Management waived the condition to pay Noor only after receiving payment from Aramark.

Nor has Noor raised a genuine dispute that Staff Management was obliged to input the work order itself or compel Aramark to do so. The Court has disregarded Rodriguez's assertion in his affidavit that Noor "relies on Staff Management to open the appropriate requisitions for … labor" performed pursuant to a direct request from Aramark. [Dkt. 194-1 ¶ 13; *see* Dkt. 186-2 at 47:1–48:17 (client is responsible for submitting the work order).] Noor argues that in emails, "Staff Management assured Noor that it would follow up with ARAMARK and that Noor would be paid for that labor." [Dkt. 194-1 ¶ 15.] The emails do not support that reading.

The relevant messages, all from Janae Brown are:

- "I will review and get back to you on this next week." [*Id.* at 19–20 (April 12, 2018).]
- Requesting additional information that "will allow management to quickly view the financial impact for each profit center." [*Id.* at 22 (April 26, 2018).]
- An indication that the "information has been forwarded to Aramark for review." [*Id.* at 27–28 (May 8, 2018).]
- In response to a request for an update: "I've been advised to contact the managers of the respective profit centers to request approval to submit the late invoicing. Upon approval, your office will have to submit labor hours through IQN to generate invoicing. I will notify you as we receive these approvals." [*Id.* at 25 (May 24, 2018).]
- In response to a question as to whether Noor should contact Aramark managers directly: "Please do not contact managers about this invoicing, but instead wait until you are contacted by the managers or our team on their behalf." [*Id.* at 31–32 (June 22, 2018).]

At best, Brown's messages indicate that Staff Management took responsibility for communicating with Aramark in connection with the disputed $206,000, and they are clear that Noor's payment is contingent on (1) Aramark's approval of the invoices

and (2) Noor's submission of the hours through the IQN. No reasonable jury could interpret "I will notify you as we receive these approvals" or "wait until you are contacted by the managers or our team on their behalf" as a promise that Staff Management would pay the disputed funds if Aramark did not.[7]

Further, the fact that Staff Management did not affirmatively reject any payment after Noor provided Aramark labor outside of the normal contractual process and the fact that Noor was paid for work done at one Aramark location do not change the result. [*See* Dkt. 194 ¶ 57; Dkt. 194-1 at 31.] Noor cites no evidence that Staff Management's approvals of payment for work directly solicited by Aramark or the payment for the single Aramark location was not effected through the VMS. Without such evidence, a jury could not find that Staff Management breached its contract as to the disputed $206,000 because no record evidence supports the finding that Staff Management ever paid or agreed to pay Noor if Staff Management was not first paid through the VMS.

Because a jury could not find that it breached the Agreement with respect to the disputed $206,000, Staff Management is entitled to summary judgment.

## B. The Disputed $1 Million

Turning to the disputed $1 million, the analysis is more straightforward. As the Court previously found, Noor's position in the bankruptcy proceedings and the resulting settlement agreement establish that Noor disposed of the disputed funds in

---

[7]     It may be possible that Brown's directive that Noor should not contact the Aramark managers directly could have impacted Noor's ability to collect from Aramark. Noor has not attempted to collect from Aramark directly in this suit, however, and it has neither argued nor introduced evidence that Brown's directive prevented it from doing so.

the Wells Fargo account to settle claims with the Chapter 11 trustee. *Noor Staffing*, 2020 WL 11762285, at *2. The only question remaining after the Court's ruling on the motion for judgment on the pleadings was "the extent of [Staff Management's] payments [into the Wells Fargo account] … and whether the payments constitute the total amount owed by Staff Management to" Noor. *Id.* The undisputed evidence shows that Staff Management paid the entirety (less one cent due to a clerical error that Noor does not pursue) of the disputed $1 million into the Wells Fargo account and that is the full amount Staff Management owes Noor in connection with that account. [Dkt. 194 ¶ 20.] Noor makes three arguments in response. The Court has already rejected its argument that there is a genuine dispute as to whether Staff Management paid the full $1 million. [*See* Dkt. 193 at 6–8.] Its other arguments fare no better.

First, it argues that the breach of contract was not Staff Management's failure to pay the $1 million, but its failure to pay the $1 million into the Sterling account. [*Id.* at 5–6.] The problem with this argument is that while misdirecting another's funds may be poor business practice or actionable under another legal theory, Noor does not identify any support in the Agreement for its position that Staff Management breached the contract by failing to pay into the correct account. It suggests that under section 8.c of the Agreement, "[t]he parties agreed that Staff Management was to deposit the funds directly into the account designated by Noor." [*Id.* at 5.] But that section says no such thing. It reads:

> Subject to Client's [Aramark's] payment to Staff Management for Supplier's [Noor's] Services, the applicable hourly rate set forth on the SOW [Statement of Work] (or such other rate as may have otherwise been agreed upon in writing by an authorized representative of Client),

21

> multiplied by, the number of the total number of labor hours worked by the Temporary Worker at that Client Location less the MSP Fee as defined in the SOW.
>
> If Supplier determines that a Temporary Worker has incurred daily or weekly overtime based on time worked solely at one or more Client Locations in Supplier's work week, and such overtime was approved in advance by the Client Location where the overtime was incurred, then Staff Management shall pay the amount calculated under Section 8.c above, plus a premium attributable to such overtime. [Calculation.]

[Dkt. 1-1 at 10–11.] Moreover, Noor has not attempted to establish that this was an implied term of the Agreement. In any event, even if there were a basis for requiring Staff Management to deposit funds in Noor's bank account of choice, Noor's remedy would not be payment of the disputed $1 million, which it already received and disposed of, but the costs incurred in connection with securing the misdirected funds. But while Noor asserts that Staff Management's conduct "den[ied] Noor access to those funds and caus[ed] significant financial distress for Noor," it cites no evidence to prove the damages it suffered. [Dkt. 194 ¶ 51.][8] Because injury is an element of a breach of contract claim, *see Pepper Const.*, 59 N.E.3d at 66, the failure to produce evidence showing Noor's damages is fatal to this theory.

Second, Noor argues that the bankruptcy settlement "preserved a $97,000 ARAMARK receivable for Noor even after crediting Noor with all of the deposits made by Staff Management in that account." [Dkt. 193 at 8.] Noor argues that it is entitled to an offset in this amount from the disputed $1 million that Staff Management paid into the Wells Fargo account. [*Id.*] But the undisputed evidence establishes that the

---

[8] Noor mistakenly cites Staff Management's motion for leave to file an oversized brief in support of this proposition [*see* Dkt. 76], but even if Noor had cited valid evidence, its claim would fail for the reasons explained above.

full $1 million was deposited into the account, and Noor used those funds to settle with the Chapter 11 trustee. Thus, even if Noor could prove that Staff Management owes it this $97,000, that obligation would arise out of Staff Management's prior dealings with Corporate, not a breach of the Agreement. [Dkt. 196 at 6–7.] The Court takes no position on whether Noor can collect those funds through other means, but because the scope of this suit is limited to Staff Management's contractual obligations under the Agreement, Noor cannot collect the $97,000 for breach of the Agreement.

Therefore, Staff Management is entitled to summary judgment with respect to the disputed $1 million.

## IV. Conclusion

For the foregoing reasons, Defendants Staff Management and PeopleScout's motion for summary judgment [Dkt. 184] is granted. Judgment shall enter in favor of Defendants and against Plaintiff Noor on Plaintiff's claims against Defendants. By separate order, the Court will direct the parties to file a status report regarding Defendants' counterclaims.

Enter: 19-cv-529
Date:  December 6, 2023

_____

Lindsay C. Jenkins
United States District Judge